## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**MARIBEL IRIZARRY-LEBRON**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 23-1073 (BJM)

### OPINION & ORDER

Maribel Irizarry-Lebron ("Irizarry") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Irizarry contends that the administrative law judge ("ALJ") erred by (1) improperly evaluating her fibromyalgia at Step Two; (2) failing to adequately cite and explain her conclusions when determining Irizarry's Residual Functional Capacity (RFC); and (3) overlooking an apparent discrepancy between the vocational expert ("VE")'s testimony and her RFC at Step Five. Docket No. ("Dkt.") 23. The Commissioner opposed. Dkt. 30. This case is before me by consent of the parties. Dkts. 14–16. For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are

not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the

Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

# BACKGROUND

### A. Medical History

The record contains medical documentation from outside the relevant period of July 8, 2016 to December 31, 2020. I focus on the documentation relevant to this period.

### 1. Physical Health

### Dr. Pedro Falla

Irizarry began treatment with Dr. Falla in 2014. Tr. 1142. In 2015, she reported pain in her left hand, which Dr. Falla determined was carpal tunnel syndrome in 2016. *Id.* In February 2016, a physical examination revealed full musculoskeletal range of motion, normal and equal strength throughout, normal gait, and normal sensation. Tr. 1172. In March 2016, Dr. Falla stated that Irizarry should not perform any repetitive movements with her left hand and should not carry, pull, or push with that hand. Tr. 1142. A physical examination that month also revealed pain on palpation of her back. Tr. 1167. In April, Irizarry reported back pain but had no pain on palpation. Tr. 1165. A May 2016 x-ray of her thoracic spine revealed mild degenerative changes. Tr. 1151. By June, Irizarry wore a hand brace to help with carpal tunnel pain, which she rated an eight out of ten. Tr. 1159. Though she had tenderness in her upper back, she had full strength in her extremities and normal reflexes. Tr. 1159. At a July 2016 examination, Irizarry had no tenderness and retained full strength in her extremities along with normal reflexes. Tr. 1157. August and September examinations led to similar findings. Tr. 1155–56. Also in September, Dr. Falla noted that Irizarry had surgery to address her carpal tunnel symptoms, but still rated her pain an eight out of ten. Tr. 1154. He also noted she reported back pain and swelling. *Id.* Dr. Falla advised Irizarry to follow up with her doctor regarding the back pain. Tr. 1155.

Dr. Falla also noted mental health symptoms during his physical examinations. During his February 2016 examination, he noted Irizarry's behavior was cooperative, attentive, and pleasant and that her insight, judgment, and memory were intact. Tr. 1172. During a July 2016 examination, he noted Irizarry had poor eye contact, but intact insight and judgment along with no suicidal ideations. Tr. 1157. And an August 2016 examination led to similar findings, except that Irizarry made good eye contact. Tr. 1156.

### Dr. Madhavi Prasad

Dr. Prasad did a nerve conduction study and electromyography test of Irizarry in February 2016 and found she had very mild left carpal tunnel syndrome. Tr. 1389. He further noted the electromyography showed no evidence of cervical radiculopathy or brachial plexopathy. *Id.*

### Southcoast Health

A March 2016 x-ray of Irizarry's spine showed no acute fractures or dislocation, but revealed mild degenerative change. Tr. 1151. Irizarry underwent an endoscopic carpal tunnel release surgery on July 11, 2016. Tr. 556–57.

### St. Anne's Hospital

Dr. Falla referred Irizarry to St. Anne's Hospital for a pain management evaluation. Tr. 1221. A June 2016 physical examination revealed Irizarry's neck was supple and her thoracolumbar spine had no obvious deformities. Tr. 1210. Irizarry also had mild limitation in range of motion of the thoracic spine, intact sensation in her upper and lower extremities, and full motor strength in both extremities. Tr. 1211. Physical examinations on July 8, 2016; July 19, 2016; and August 29, 2016 revealed similar findings. Tr. 1197–98, 1200, 1204–05. Also, Irizarry's gait was noted as normal on July 19, 2016. Tr. 1201.

**Dr. Nelson Colón**

Dr. Colón evaluated Irizarry on August 31, 2017. Tr. 1231. He found her gait was normal without the use of an assistive device. Tr. 1235. However, he noted tenderness to palpation and spasms at her cervical and lumbar soft tissues. Tr. 1232. Dr. Colón found Irizarry had decreased range of motion in her back and neck. Tr. 1237. However, her straight leg raising test was negative. Tr. 1232. X-rays revealed straightening of the normal cervical lordosis in the cervical spine and mild thoracic dextroscoliosis of the thoracic spine. Tr. 1239. Dr. Colón diagnosed Irizarry with cervicalgia and lumbago and noted Irizarry's pain in her left hand, left wrist, and knees. Tr. 1234.

**Dr. Lucinda Wheelock, Dr. Lourdes Marrero, and Dr. Pedro Nieves**

**(Consultative Examiners)**

Dr. Wheelock evaluated Irizarry's condition after she filed her disability claim in 2016. She found Irizarry could lift and/or carry 20 pounds frequently and 10 pounds occasionally. Tr. 739. Aside from these limitations, Dr. Wheelock determined Irizarry could push or pull without limitation. *Id.* Dr. Wheelock further found Irizarry could stand and/or walk for six hours in an eight-hour workday and sit for the same period. Tr. 739. And she found Irizarry could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, and crouch; occasionally crawl; and occasionally reach in any direction (including overhead) with the left upper extremity. Tr. 739–40.

Dr. Lourdes Marrero reviewed Irizarry's file on July 17, 2018 and affirmed Dr. Wheelock's opinion that Irizarry should be restricted to light work, but opined that she had no limitations with reaching overhead and could frequently handle and finger with the left hand. Tr. 757–59. On March 8, 2019, Dr. Pedro Nieves reviewed Irizarry's file and affirmed Dr. Wheelock and Dr. Marrero's opinions that Irizarry should be restricted to light work. Further, Dr. Nieves affirmed the opinion

of Dr. Marrero that Irizarry had no overhead reaching limitations and could frequently handle and finger with the left hand. Tr. 777–78.

**San Carlos Hospital**

On December 28, 2018, Irizarry visited an emergency room with back pain. Tr. 1324. A physical examination determined she had a full range of motion in her back and extremities. Tr. 1317. X-rays of the lumbosacral spine revealed multilevel degenerative facet joint arthrosis. Tr. 1314. Thus, Irizarry was discharged in good condition. Tr. 1324. However, she returned to the emergency room on January 10, 2019, reporting back pain. Tr. 1296. At that time, a physical examination showed paraspinal tenderness and muscle spasm. Tr. 1286. However, Irizarry's gait was normal. Tr. 1293. The following day, Irizarry was not in pain and was discharged from the hospital. Tr. 1497.

**Dr. Wilfredo Perez Caban**

In 2018 and through August 2019, Dr. Perez documented that Irizarry had a history of fibromyalgia, but could independently dress herself, move around, care for her personal hygiene, eat, and move from a bed to a chair. *See* Tr. 493, 497, 501, 508. Further Irizarry could independently do heavy housework, manage money, plan and cook full meals, shop for groceries and clothes, take medication in the right dose at the right time, drive, take public transportation, and use a telephone. *Id.* During Dr. Perez's physical examinations, Irizarry was alert and in no acute distress and showed no abnormalities. Tr. 494, 498, 502, 510.

**Puerto Rico Department of Family Affairs**

On February 11, 2020, Puerto Rico's Department of Family affairs issued a letter stating Irizarry had fibromyalgia, depression, and hypothyroidism. Tr. 1619. Thus, it stated she was permanently disabled. *Id.*

**Dr. Jorge Padilla-Rodriguez**

In March 2020, Dr. Padilla Rodriguez performed motor and nerve conduction studies on Irizarry. Tr. 1620–21. He stated most attempts to evaluate Irizarry caused her to complain of pain. Tr. 1620. However, he noted no gross gait disturbances, range of motion within functional limits, and nearly full motor power in both hands. *Id.* He found Irizarry's sensibility inconsistent and noted spasm of the cervical PVMs, presumably paravertebral muscles. *Id.* He concluded Irizarry suffered from mild bilateral median neuropathy at the wrist involving her sensory fibers. Tr. 1621.

**2. Mental Health**

**Dr. Amanda Caro (Consultative Examiner)**

In August 2017, Dr. Caro conducted a psychiatric examination of Irizarry. Tr. 1227–30. She observed Irizarry made fair eye contact; had marked psychomotor retardation; spoke slowly but fluently, coherently, and logically; and was depressed with a markedly constricted affect. Tr. 1228. However, she noted Irizarry had no suicidal or homicidal ideations, denied hallucination, and had no delusions. *Id.* Dr. Caro found Irizarry's concentration was impaired because she could not subtract seven from one-hundred five times or spell the Spanish word "mundo" backwards. *Id.* Dr. Caro found Irizarry could recall zero out of three unrelated objects after five minutes, but could remember how she arrived at the appointment, what happened a few hours prior, her date of birth, and other past events. *Id.* Nevertheless, Dr. Caro stated Irizarry had no capacity to handle funds and that her prognosis was poor. *Id.*

**Dr. Jeannette Maldonado and Dr. Janice Calderon (Consultative Examiners)**

In July 2018, Dr. Jeannette Maldonado evaluated Irizarry's mental health records in connection with her application. Dr. Maldonado found Irizarry had moderate limitations in understanding, remembering, and applying information; mild limitations in interacting with others;

moderate limitations in concentrating, persisting, and maintaining pace; and mild limitations in adapting or managing oneself. Tr. 756. And Dr. Maldonado found Irizarry did not meet the paragraph C criteria. *Id.* Dr. Calderon reviewed Irizarry's file on March 8, 2019 and affirmed Dr. Maldonado's opinion. Tr. 775–76.

### Sistema San Juan Capistrano

Irizarry was admitted to San Juan Capistrano's partial hospitalization program on September 16, 2019. Tr. 521. That morning, she reported a weak desire to live and occasional suicidal thoughts. Tr. 609. Further, she was depressed, hardly communicative, and had a fluctuating mood, flat affect, concerned facial expression. Tr. 521–22. She exhibited similar behavior the following day, Tr. 524–25, and on September 18. Tr. 528–30. By September 19, Irizarry had what doctors described as an appropriate affect. Tr. 534. However, she remained otherwise unchanged. *Id.* While hospitalized, Irizarry reported frequently having little interest or pleasure in doing things, feeling tired or having little energy; and struggling to eat normally, concentrate, and move around. Tr. 612. She further reported often feeling down, depressed, or hopeless; struggling to regulate her sleep; and feeling bad about herself. *Id.* When she was discharged on September 20, Irizarry was logical, coherent, and alert, but hardly communicative. Tr. 537. Though her mood remained fluctuating and she had a restricted affect, she was receptive and socialized appropriately. *Id.* An evaluation showed that, between her admission and release from San Juan Capistrano, Irizarry improved her activity level, conceptualization, independence, socialization, involvement in activities, concentration, coordination, ability to follow instructions, problem-solving skills, initial learning capability, interest in activities, and decision-making skills. Tr. 577. Her doctor determined she had significantly improved her symptoms and had achieved the maximum benefit of the partial hospitalization program. Tr. 603.

**APS Clinics**

Irizarry visited APS clinics from April 2017 to July 2021. Tr. 623–710, 1439–80, 1531–1542. I focus on her records up until her date last insured in December 2020. In April 2017, her appearance and speech were appropriate, she had a logical thought process, and she denied suicidal and homicidal thoughts. Tr. 1477. Further, she was oriented to time, place, and person; her immediate, recent, and remote memory were intact; her concentration was adequate; her intellectual functioning was average; her insight was adequate; and her judgment was good. Tr. 1478. Examiners made similar findings in July 2017, Tr. 1472–74; February 2018, Tr. 1466–67; May 2018, Tr. 1459–60; June 2018, Tr. 1452–53; November 2018, Tr. 1447–48; and December 2018. Tr. 1440–41. At this last examination, APS referred Irizarry to a physiatrist and rheumatologist for her pain. Tr. 1481.

In February 2019, Irizarry's appearance and speech were appropriate, she had a logical and relevant thought process, and she denied suicidal and homicidal thoughts. Tr. 1536. Further, she was oriented to time and place; her immediate, recent, and remote memory were intact; her concentration was deteriorated; her intellectual functioning was average; and her judgment was good. Tr. 1537. A June 2019 examination led to similar findings except that she was orientated to time, place, and person, and her concentration had improved to adequate. Tr. 1532–1533.

In September 2019, Irizarry experienced irritability, poor impulse control, and unspecified symptoms of depression and anxiety. Tr. 705. She denied experiencing side effects from medication, but also did not experience an improvement in her symptoms. *Id.* She indicated she was stressed due to family problems, but had no suicidal or homicidal ideas and no psychotic symptoms. *Id.* At the time, Irizarry reported she sold multiple pieces of furniture she valued at $4,000 for just $100. Tr. 1542. She also stated she tried to grab some knives, but that her husband

hid them from her. *Id.* At some point, she hit her husband and broke objects in their home. *Id.* APS notes from the time stated Irizarry had poor impulse control, decreased concentration, fair judgment, and decreased insight. Tr. 706–07. Otherwise, she exhibited normal behavior. *Id.* Irizarry displayed similar symptoms in December 2019, Tr. 702, but stated she felt better. Tr. 693.

By March 2020, Irizarry exhibited improved judgment, but otherwise remained unchanged. Tr. 690. In June of that year, Irizarry once again showed decreased concentration, but otherwise remained unchanged. Tr. 678. She similarly stated she felt fine with her recommended treatment. Tr. 669. In September, Irizarry improved by showing normal impulse control, but otherwise remained unchanged. Tr. 666. At that time, she stated she felt fine and was not experiencing symptoms. Tr. 657. She again showed normal impulse control in December 2020. Tr. 654. And she also exhibited adequate concentration, good judgment, and adequate insight at that time. *Id.* She stated then that she felt fine and was stable with her treatment. Tr. 645.

**Substance Abuse and Mental Health Services Administration ("ASSMCA")**

In October 2019, Irizarry received treatment at Puerto Rico's Substance Abuse and Mental Health Services Administration, known by its Spanish-language acronym, ASSMCA. Tr. 711–22. There, doctors noted she presented the following symptoms related to depression and bipolar disorder: crying, sadness, hopelessness, frustration, guilt, lack of interest, low spirits, lack of concentration, difficulty paying attention, and problems with her sleep pattern. Tr. 714. She also presented symptoms of anxiety and panic attack episodes, depressed and anxious mood, accelerated thoughts, impulsivity, flight of ideas, auditory and visual hallucinations, and suicidal ideas without an established plan. *Id.* And ASSMCA doctors noted Irizarry presented physical problems related to her diagnoses of fibromyalgia, osteoarthritis, hypertension, and hypothyroidism. *Id.* Though they stated these limited Irizarry's physical activities, they did not

elaborate beyond saying she took Relafen twice a day along with daily doses of vitamin D and 75 mg of Synthroid. *Id.* Doctors noted Irizarry's hospitalization in 2019 and that she took 150 mg of Bupropion, 50 mg of Benadryl at bedtime, and 500 mg of Depakote. Tr. 715.

Despite her symptoms, at her initial screening in October 2019, Irizarry looked logical, coherent, and oriented; denied suicidal and homicidal ideas; had a good mood; but reported feeling sad, episodes of poor control of impulses, and anxiety. Tr. 717. ASSMCA doctors recommended Irizarry continue with her current treatment of therapy, medication, and support group meetings. Tr. 719–21.

### Dr. Diana I. Santos Norat

Dr. Santos Norat treated Irizarry from December 2019 until July 2021. Tr. 723. During that time, she noted Irizarry took no medication for her fibromyalgia, but took Depakote, Seroquel, and Ativan for her depression. *Id.*

## B. Procedural History

Irizarry filed an application for disability benefits on September 14, 2016 claiming an onset date of July 8, 2016. Tr. 1015. Irizarry first appeared at a hearing before an ALJ on November 7, 2019. Tr. 430. After that hearing, the ALJ denied Irizarry's claim, Irizarry appealed, and the Appeals Council remanded her claim. Tr. 915, 952. Irizarry again appeared at a hearing before an ALJ on December 7, 2021. Tr. 407.

At the December 2021 hearing, Irizarry testified she had not driven since 2018 because of her nerves. Tr. 414. Instead, she explained that her brother drives her when she needs to attend appointments or run errands. Tr. 415. She also testified she previously worked as a packager of sheets and bedding for hospitals. Tr. 416. In that role, she explained she carried boxes weighing up to 10 pounds. Tr. 416–17. She explained she stopped working in 2016 because her joints and

lower back hurt and, when she raised this with her supervisor, she was told to go home. Tr. 417. Irizarry further clarified she had joint pain in her knees, arms, feet, and neck. Tr. 417.

She testified that, at some point, she had surgery on her left hand and her employer asked her to return to work one week later. Tr. 417–18. When Irizarry responded that she could not yet return, her employer fired her. Tr. 418. Irizarry explained she had no strength in her hand and could not use it to pick up items as her job required. Tr. 418-19. She further explained that she did not seek another job due to the pain in her arms and hands. Tr. 419.

Upon questioning by her attorney, Irizarry explained she also suffers from anxiety, depression, and rage attacks. Tr. 420. She further explained she was hospitalized because of her anxiety and depression. Tr. 421. Irizarry also stated she had suicidal thoughts at one point, but no longer has them. Tr. 421. Because of her conditions, she explained she overeats and does not like socializing with others or having friends. Tr. 422. Irizarry also recounted that she had problems with neighbors because she believed her neighbors were watching her. Tr. 423. Additionally, she explained she has to write everything down because she is forgetful, she needs medication to sleep, and she spends most of her days in bed. Tr. 423.

A VE, Guillermo Peña, then testified. He stated Irizarry was previously employed as a laundry laborer (DOT 361.687-018). Tr. 425. The ALJ asked the VE whether Irizarry could perform this job given her age, education, and work experience and her ability to do the following: light work, except that she can do handling and fingering frequently with her left hand; climb stairs and ramps frequently; never climb ladders; balance, stoop, kneel, and crouch frequently; never be exposed to unprotected heights; and occasionally can be exposed to moving mechanical parts and operating motor vehicles. Tr. 426. Further the ALJ asked the VE to note Irizarry is limited to simple, repetitive, routine tasks; her use of judgment and ability to adapt to changes in the work

*Maribel Irizarry-Lebron v. Commissioner of Social Security,* Civil No. 23-1073 (BJM)                14

setting is limited to simple, work-related decisions; she can interact with coworkers and supervisors frequently; and she can interact with the public occasionally. Tr. 426. The VE replied that a person with these limitations could not perform Irizarry's prior work. *Id.* However, the VE found Irizarry could work as a garment sorter, DOT (DOT 222.687-014), a cafeteria attendant (DOT 311.677-010), and a classifier (DOT 361.687-014). *Id.*

The ALJ then asked the VE to consider someone with the same limitations discussed above but who was limited in both hands to handling and fingering frequently. Tr. 427. The VE responded that such a person could perform the same alternative occupations already discussed. *Id.*

The ALJ next inquired whether someone with Irizarry's limitations, but further limited to sedentary work, could perform any available jobs. The VE responded that such a person could work as a tube operator (DOT 239.687-014), surveillance system monitor (DOT 379.367-010), and election clerk (DOT 205.367-030). *Id.*

Finally, Irizarry's attorney asked whether someone could perform the VE's alternative jobs if, for 20 percent of the workday, she was distracted, unable to work, and distracting coworkers due to her behavior. Tr. 428. The VE responded that such a person could not do any of the previously discussed jobs. *Id.*

The ALJ announced her decision on February 15, 2022. Tr. 385–400. She found Irizarry had not engaged in substantial gainful activity between the alleged onset date, July 8, 2016, and her date last insured, December 31, 2020. Tr. 387. Further, the ALJ found Irizarry had the following severe impairments: bilateral carpal tunnel syndrome, status post carpal tunnel release in 2016; cervicalgia; lumbago; depressive disorder; anxiety disorder; and bipolar disorder. Tr. 388.

At the same time, the ALJ found the following impairments were non-severe: thyroid disorder; fibromyalgia syndrome; osteoporosis; pain disorder; hematuria; obesity; sleep

disturbance; cannabis dependence; opioid dependence; sedative, hypnotic, or anxiolytic dependence; acute nasopharyngitis; polyosteoarthritis; and myofascial pain syndrome. *Id.* The ALJ reasoned that Irizarry's thyroid disorder was treated with Synthroid; her fibromyalgia was treated with Tylenol with codeine; her pain syndrome and myofascial pain syndrome were treated with baclofen, Naprosyn, and trigger point injections; and her sleep disturbance was treated with Remeron. Tr. 388. Next, the ALJ found Irizarry's hematuria, polyosteoarthritis, acute nasopharyngitis, cannabis dependence, and opioid dependence gave rise to no specific limitations or treatment. *Id.* Finally, the ALJ found Irizarry's generalized abdominal pain was not severe because it was treated with omeprazole and tests all revealed normal results. *Id.*

Proceeding to Step Three, the ALJ found Irizarry did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 389. In support of this determination, the ALJ noted that she had considered Listing 1.15, 1.16, and 1.18 when analyzing Irizarry's musculoskeletal disorders. *Id.* However, the ALJ found that Irizarry did not meet paragraph D of those listings, which requires Irizarry furnish medical documentation of (1) her need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; (2) an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (3) an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. *Id.* Because Irizarry did not provide such documentation, the ALJ found she did not meet any of the musculoskeletal listings considered. *Id.*

Next, the ALJ found Irizarry's thyroid disorder symptoms did not meet listing 9.00 and SSR 14-3p, although she did not explain why. The ALJ determined Irizarry did not meet listing 11.14, for peripheral neuropathy, because she did not have a disorganization of motor function in two extremities resulting in an extreme limitation in her ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Tr. 389–90. Next, the ALJ found Irizarry suffered from no marked limitation in physical functioning and in what is known as the paragraph B criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. Tr. 390.

The ALJ next considered listing 14.09, for inflammatory arthritis, but found Irizarry did not satisfy part A, B, C, or D of that listing. Tr. 390. And though the ALJ stated she considered Irizarry's obesity, she found it did not affect Irizarry in any way that would allow her to meet a listing. *Id.*

The ALJ then explained her findings regarding the paragraph B criteria. There, the ALJ found Irizarry had moderate limitations in (1) understanding, remembering, or applying information; (2) interacting with others; and (3) concentrating, persisting, or maintaining pace. Tr. 391. However, the ALJ found only mild limitations in the area of adapting or managing oneself. *Id.*

The ALJ found Irizarry had moderate limitations understanding, remembering, or applying information because she needed reminders to take care of her personal hygiene, groom, and take medication. Tr. 391. Further, Irizarry had difficulty following written and spoken instructions and her memory was fair. *Id.* And at her November 2019 hearing, she testified that she was forgetful. *Id.* Nevertheless, during mental status examinations conducted by Irizarry's psychiatrist, her

thought process was logical, relevant, and coherent, and her immediate, recent, and remote memory were intact. *Id.* Further, her intellectual functioning was average. *Id.*

Next, the ALJ found Irizarry had moderate limitations interacting with others because she socially isolates herself, but maintains a relationship with her husband and sister. *Id.* Further, the ALJ noted Irizarry had never been fired or laid off from a job due to problems getting along with others. *Id.* Additionally, at mental status examinations conducted by Irizarry's psychiatrist, her appearance and speech were appropriate and she exhibited cooperative and calm behavior. *Id.* However, during the psychiatric consultative examination, she made fair eye contact and exhibited marked psychomotor retardation. *Id.* Further, her speech was slow-paced, but fluent, coherent, and logical. *Id.* And at the November 7, 2019 hearing, Irizarry testified she was irritable. *Id.*

The ALJ then explained that Irizarry had moderate limitations concentrating, persisting, or maintaining pace because she was able to prepare simple meals and do household chores like washing dishes, sweeping, mopping, and cleaning bathrooms. *Id.* Further, the ALJ noted Irizarry could pay bills, count change, handle a savings account, and write checks and money orders. *Id.* The ALJ also observed that Irizarry's psychiatrist found her oriented to time and place during examinations. *Id.* However, during an August 9, 2017 consultative examination, Irizarry was only partially oriented to time and place and her concentration was impaired. *Id.* Specifically, she was not able to subtract seven from a hundred five times, and was unable to spell the word "world" backwards. *Id.* And Irizarry's psychiatrist found her concentration was diminished. *Id.*

Finally, the ALJ found Irizarry had mild limitations adapting or managing herself because she reported difficulties handling stress and changes in routine. *Id.* Further, the consultative examiner found her insight and judgment were poor. *Id.* Additionally, Irizarry's psychiatrist found she had diminished insight and fair judgment. Tr. 392. However, she denied suicidal and homicidal

ideations. Tr. 391–92. And though she was hospitalized for psychiatric reasons in September 2019, Irizarry responded well to treatment and her condition had significantly improved by the time she was discharged. Tr. 391.

Though she found Irizarry did not satisfy the paragraph B criteria, the ALJ also evaluated the paragraph C criteria. The ALJ found Irizarry did not meet this criteria because there was no evidence of a serious and persistent mental disorder lasting more than two years that required both (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of a mental disorder; and (2) a minimal capacity to adapt to changes to Irizarry's environment or to demands that are not already part of her daily life. Tr. 392.

The ALJ then determined Irizarry's RFC before proceeding to Step 4. She concluded Irizarry could perform light work except that she could frequently handle and finger with the bilateral upper extremities; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; never work at unprotected heights; and occasionally be exposed to moving mechanical parts and operating a motor vehicle. Tr. 392. Further, the ALJ found Irizarry could perform simple, routine, and repetitive tasks; use judgment and deal with changes in the work setting; make simple work-related decisions; frequently interact with supervisors and coworkers; and occasionally interact with the public. *Id.*

In determining Irizarry's RFC, the ALJ noted Irizarry alleged at her November 2019 hearing that she was disabled due to lower back pain and carpal tunnel syndrome. Tr. 393. And at the December 2021 hearing, the ALJ recounted that Irizarry stated she was disabled due to joint pain, weakness of the upper extremities, panic attacks, anxiety, and depression. *Id.*

The ALJ began her analysis of Irizarry's allegations with Irizarry's musculoskeletal impairments. She noted Irizarry had been diagnosed with cervicalgia and lumbago. Tr. 393. In reviewing Irizarry's 2016 examinations, the ALJ found that, in February, Irizarry had full range of motion and normal strength, gait, and sensation. *Id.* However, in March, Irizarry had pain on palpation of her back and an x-ray of her thoracic spine showed mild degeneration. *Id.* At examinations in June, July, and August, Irizarry had no obvious deformities, although she had a mild limitation in the range of motion of her thoracic spine. *Id.* Nevertheless, she had intact sensation and normal motor strength in her upper and lower extremities. *Id.* And in July, her gait was noted to be normal. *Id.*

 Further, at a consultative examination in 2017, Irizarry had normal gait without the use of an assistive device. *Id.* However, she had tenderness to palpation and spasms at the cervical and lumbar soft tissues. Additionally, she had decreased range of motion in her back and neck. *Id.* X-rays revealed straightening of the normal cervical lordosis in the cervical spine and mild thoracic dextroscoliosis of the thoracic spine. *Id.* Lastly, her straight-leg-raising test was negative. *Id.*

Moving to 2018, the ALJ observed treatment notes from July and October stated Irizarry could independently care for her personal hygiene, do light household chores, manage money, prepare meals, shop, take medication, drive, and use her phone. Tr. 393–94. Further, her gait was normal during this time. Tr. 394. The ALJ noted Irizarry visited an emergency room due to back pain in December 2018. *Id.* However, she had a full range of motion in her back and extremities at that time. *Id.* X-rays of the lumbosacral spine revealed multilevel degenerative facet joint arthrosis and doctors told Irizarry to follow up with her physician. *Id.* The ALJ documented that Irizarry then returned to the emergency room with back pain on January 10, 2019. *Id.* And on

physical examination, there was paraspinal tenderness and muscle spasm. *Id.* However, her gait was normal at this time and at a follow-up examination on January 14, 2019 *Id.*

As for Irizarry's hands, the ALJ noted she reported wrist pain and a nerve conduction study in February 2019 revealed very mild left carpal tunnel syndrome. *Id.* The ALJ observed that Irizarry underwent left carpal tunnel release surgery in July 2016 and that, at a consultative examination approximately one year later, she was able to grip, grasp, and pinch with the bilateral hands. *Id.* Further, Irizarry had 5/5 muscle strength in her right hand and 4-/5 strength in her left hand. *Id.* Additionally, Tinel and Phalen tests were negative in the bilateral hands. *Id.* Finally, the ALJ noted a March 2020 physical examination showed 4/5 motor power in the bilateral hands while a nerve conduction study revealed mild bilateral median neuropathy at the wrist, consistent with bilateral carpal tunnel syndrome. *Id.*

Turning to Irizarry's mental conditions, the ALJ noted she had been diagnosed with anxiety disorder, bipolar disorder, and depressive disorder and experienced the following symptoms: crying spells, irritability, anger, depressed mood, social isolation, anxiety, irrational fears, poor sleep, poor concentration, memory problems, poor self-esteem, and feelings of worthlessness. *Id.* However, the ALJ observed that, at a February 2016 examination, Irizarry was cooperative, attentive, and pleasant with intact insight, judgment, and memory. Tr. 394. Further, at examinations in July and August of that year, Irizarry had intact judgment and insight and no suicidal ideations. *Id.* However, she exhibited poor eye contact at the July 2016 examination. *Id.*

Irizarry exhibited appropriate appearance and speech at examinations in April and July 2017. Tr. 394. Further, she had a logical thought process; was orientated to time, place, and person; and had an intact immediate, recent, and remote memory. *Id.* Additionally, she had adequate concentration, average intellectual functioning, adequate insight, good judgment, and no

suicidal or homicidal ideations. *Id.* At consultative examination in August, Irizarry's eye contact was fair and she showed marked psychomotor retardation. Tr. 394–95. Her speech was slow-paced, but fluent, coherent, and logical. Tr. 395. And she was partially oriented in time and place. *Id.* Further, her concentration was impaired as she was not able to subtract seven from one hundred five times, or spell the word "world" backwards. *Id.* Additionally, the ALJ noted Irizarry's immediate memory was fair and her short-term memory was impaired because she recalled 0/3 unrelated objects after 5 minutes. *Id.* Her recent and remote memory were also fair and her insight and judgment were poor. *Id.* However, she denied suicidal and homicidal ideations. *Id.*

At consultative examinations in February, May, and August 2018, Irizarry exhibited diminished concentration. *Id.* However, treatment notes from November of that year showed her symptoms had improved with medication. *Id.* Her speech was appropriate; her thought process was logical; she was oriented to time, place, and person; and her immediate, recent, and remote memory was intact. *Id.* Further, her concentration was adequate, her intellectual functioning was average, her insight was adequate, and her judgment was good. *Id.* Additionally, she denied suicidal ideations. And though she showed diminished concentration in December, she reported doing well. *Id.*

Likewise, Irizarry reported doing well at a February 2019 examination. *Id.* However, in September, she was hospitalized for five days due to poor impulse control and participated in group therapy which significantly improved her condition. *Id.* At an examination three days after her discharge, Irizarry had an appropriate appearance and speech along with cooperative behavior. *Id.* She further was oriented to time, place, and person, and had a logical, relevant, and coherent thought process. *Id.* And though her immediate, recent, and remote memory was intact, her concentration was diminished. *Id.* While she had average intellectual functioning, her insight was

diminished and her judgment was fair. *Id.* Nevertheless, he denied suicidal ideations. *Id.* And a December 2019 examination revealed similar results. *Id.*

At examinations in June, September, and December 2020, Irizarry exhibited appropriate speech and calm behavior. *Id.* Further, her thought process was logical; she was oriented to time, place, and person; her immediate, recent, and remote memory were intact; her concentration was diminished; her intellectual functioning was average; her insight was diminished; and her judgment was fair. *Id.*

Turning to opinion evidence, the ALJ noted Irizarry had a GAF score of 45-50, indicative of serious symptoms, but gave this score no significant weight. Tr. 395–96. Next, the ALJ gave some weight to a March 2016 letter from Dr. Pedro Falla stating Irizarry should not perform any repetitive movements with her left hand and should not lift, carry, pull, or push with that hand. Tr. 396. The ALJ noted Irizarry subsequently underwent surgery to correct this condition. *Id.* Nevertheless, the ALJ noted a March 2020 nerve conduction study revealed mild bilateral median neuropathy at the wrist, consistent with bilateral carpal tunnel syndrome. *Id.*

The ALJ then gave some weight to the opinions of three doctors who reviewed Irizarry's medical file: Dr. Lucinda Wheelock, Dr. Lourdes Marrero, and Dr. Pedro Nieves. *Id.* Those doctors opined that Irizarry "could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8 hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, and crouch; occasionally crawl; and occasionally reach in any direction (including overhead) with the left upper extremity." *Id.*

The ALJ gave little weight to Dr. Amanda Caro's opinion that Irizarry could not manage funds. Tr. 397. The ALJ noted Irizarry reported she could pay bills, count change, handle a savings

account, and write checks/money orders. *Id.* Further, mental status examiners concluded Irizarry could prepare meals and do chores. *Id.* And her treating physician stated she could manage money, shop, drive, take medication, and use the phone. *Id.*

The ALJ gave some weight to Dr. Jeannette Maldonado's opinion that Irizarry had moderate limitations in understanding, remembering, and applying information; mild limitations in interacting with others; moderate limitations in concentrating, persisting, and maintaining pace; and mild limitations in adapting or managing oneself. *Id.* The ALJ found the evidence largely supported this opinion, but decided Irizarry had moderate limitations interacting with others based on her reports of irritability, social isolation, and anger. *Id.*

Finally, the ALJ noted a February 2020 letter from the Department of Family Affairs stated Irizarry was completely disabled and a letter from Puerto Rico's Administration of Mental Health and Addiction stated Irizarry does not work due to emotional and physical conditions. *Id.* The ALJ gave the first letter no weight because the issue of Irizarry's disability is reserved to the Commissioner's determination. *Id.* She gave the second letter little weight for the same reason and because it did not discuss Irizarry's ability to perform less demanding work. Tr. 397–98.

Accordingly, the ALJ found Irizarry could not perform her previous work as a laundry laborer, and proceeded to Step Five. Tr. 398. There, she found that, as of the alleged onset date Irizarry was 45 years-old and thus defined as a younger individual. *Id.* However, the ALJ noted Irizarry subsequently entered the closely approaching advanced age category. *Id.* Further, she had at least a high school education. *Id.* Given Irizarry's background and RFC, the ALJ adopted the VE's finding that, though Irizarry could not perform her past relevant work, she could work as a garment sorter, cafeteria attendant, or classifier. Tr. 398–99.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Irizarry challenges ALJ's Step Two, RFC, and Step Five analyses. At Step Two, she contends the ALJ inappropriately analyzed her fibromyalgia. She argues the ALJ ignored evidence and failed to explain her reasoning when determining her RFC. And at Step Five, she asserts the ALJ overlooked a conflict between the RFC and the requirements of jobs the VE stated she could perform. The Commissioner argues that none of these omissions were inappropriate and, even if they were, they would not warrant remand. I address each issue in turn.

### I.        Step Two – Fibromyalgia

Irizarry argues the ALJ failed to comply with SSR 12-2p because she never mentioned the 1990 or 2010 fibromyalgia criteria outlined in that ruling and did not conduct the longitudinal analysis the ruling requires. Dkt. 23 at 29–30. The Commissioner responds that the criteria Irizarry references are relevant in deciding whether a claimant has medically determinable impairment and the ALJ decided that issue in Irizarry's favor. Dkt. 30 at 13–14. As for the longitudinal analysis, the Commissioner argues the ALJ considered the entire record and no opinion in that record discusses the functionally limiting effects of Irizarry's fibromyalgia. *Id.* at 14. The Commissioner has the better arguments.

### A.        1990 and 2010 Criteria

SSR 12-2P states the Commissioner will use the referenced criteria to determine whether a claimant has a medically determinable impairment. SSR12-2P, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012). Though Irizarry cites to the ALJ's 2019 decision as an example of where the ALJ properly evaluated her fibromyalgia according the SSR 12-2P criteria, that decision only illustrates the point. In her 2019 decision, the ALJ cited the criteria to say that Irizarry's fibromyalgia did not meet the criteria and thus did not constitute a medically determinable impairment. Tr. 793–94. By

contrast, in the ALJ's 2022 decision that Irizarry now appeals, the Commissioner found Irizarry's fibromyalgia constituted a non-severe medical impairment. Tr. 388. Because the ALJ found Irizarry's fibromyalgia constituted a medically determinable impairment, even if the ALJ's decision not to discuss the 12-2P criteria was an error, it did not prejudice Irizarry.

### B.    Longitudinal Analysis

Regarding the ALJ's failure to conduct a longitudinal analysis, Irizarry cites dozens of pages documenting her fibromyalgia treatment that she contends the ALJ overlooked. Dkt. 23 at 31. Even if the ALJ should have more thoroughly discussed these records, Irizarry failed to explain how that omission prejudiced her. And as discussed below, a review of the record shows no conceivable way that it did.

First, I note Irizarry cites the ALJ's two decisions in this case discussing her fibromyalgia, Dkt. 23 at 31 (citing Tr. 388, 793, 796), and a treatment record the ALJ explicitly referenced in her 2022 decision. *Id.* (citing Tr. 1481). She also cited a letter from Puerto Rico's Department of Family Affairs stating she could not work, Tr. 1619, which the ALJ discussed and gave no weight because that decision is reserved for the Commissioner. Tr. 397. These documents plainly do not support Irizarry's contention that the ALJ failed to discuss her fibromyalgia treatment history.

Irizarry also cited numerous records documenting that she had been previously diagnosed with fibromyalgia, Tr. 691, 714, 718, 723, 1531, along with a list of her mental health medications. Tr. 659. However, the ALJ agreed that Irizarry suffered from fibromyalgia. Tr. 388. And I am unclear how a list of mental health medication constitutes a treatment record for that condition. Irizarry testified she took Tylenol with codeine to treat her fibromyalgia, Tr. 441, which the ALJ acknowledged. Tr. 388. Accordingly, any failure to consider these records was harmless because they do not go beyond information the ALJ addressed in her decision.

Irizarry also cites records from 2018 and 2019 showing that, while she has a history of fibromyalgia, she can independently dress herself, move around, care for her personal hygiene, eat, and move from a bed to a chair. *See, e.g.*, Tr. 493, 497, 501, 508. And these notes further document Irizarry's abilities to independently do heavy housework, manage money, plan and cook full meals, shop for groceries and clothes, take medication in the right dose at the right time, drive, take public transportation, and use a telephone. *Id.* Contrary to Irizarry's contention, the ALJ discussed these records throughout her opinion. Tr. 394–97. And they support the ALJ's conclusion that Irizarry had fibromyalgia, but that the impairment was not severe.

Irizarry also points to records from a September 2019 mental health hospitalization, and the period immediately preceding that hospitalization, where doctors noted her fibromyalgia. Tr. 564, 567, 575, 615, 1542. However, even characterizing these as fibromyalgia treatment records, the ALJ addressed Irizarry's hospitalization by explaining that it improved her mental health symptoms and citing evidence in the record supporting that conclusion. Tr. 391 (citing Tr. 513–80). Further, the evidence from 2020 that Irizarry insists the ALJ overlooked also supports that conclusion. *See* Tr. 645, 655, 667, 669, 679, 681, 693 (reflecting condition as stable or without symptoms). Though Irizarry cites a 2020 examination write-up noting her fibromyalgia, that examination was conducted to assess her bilateral hand pain. Tr. 1620. And the ALJ cited it when incorporating manipulative limitations in Irizarry's RFC. Tr. 396.

Irizarry also cites psychiatric notes from 2021 and 2022, Tr. 146, 625, 627, 637, 642, along with the Spanish-language version of some of those records. Tr. 191, 1628, 1645, 1694. However, these are irrelevant to the ALJ's analysis of whether Irizarry was disabled between July 8, 2016 and December 31, 2020. And finally, I note that two of Irizarry's cited pages contain no

information because they are marked as duplicates of information elsewhere in the record documenting Irizarry's mental health symptoms. *See* Tr. 583, 585.

In sum, the records Irizarry contends the ALJ overlooked were either expressly addressed in the ALJ's decision or irrelevant to the analysis of whether she was disabled between July 2016 and December 2020.

## II.   RFC

Irizarry contends the ALJ failed to discuss various documents in the record and did not adequately explain her conclusions for many of the items she did discuss. Dkt. 23 at 14–28. Regarding the failure to discuss documents, Irizarry contends the ALJ (1) did not mention several pieces of evidence; (2) failed to mention various non-severe impairments; and (3) failed to address her medicinal side effects. As for the ALJ's inadequately explained conclusions, Irizarry argues she (4) failed to explain how she determined Irizarry could perform light work; (5) did not state which of Irizarry's mental health symptoms stemmed from her bipolar disorder; (6) relied on boilerplate language to address Irizarry's subjective complaints; and (7) neglected to cite to the record when evaluating various medical opinions. I evaluate each claim below and find that none warrants remand.

### A.  Unmentioned Evidence

### 1.  Medical Records

First, Irizarry lists a slew of medical documentation that she contends the ALJ failed to discuss. *Id.* at 16–19. Specifically, she argues the ALJ omitted any mention of (1) Dr. Caban's notes stating she had a prior history of falls; (2) Irizarry's January 2019 statements that she struggled to get up, squat, bend, reach, walk, sit, and kneel; (3) the ALJ's January 2020 decision finding Irizarry had undergone trigger point injections; (4) Dr. Pedro Falla's July 2016 progress

notes discussing hand surgery, disc degeneration and Irizarry's statements she can't stand for too long; (5) Dr. Dominguez's July 2016 notes regarding worsening depression, anxiety disorder, steroid injection for severe back pain, and pain related to carpal tunnel; (6) a San Carlos Borromeo hospital report documenting low-back and wrist pain; (7) December 2018 studies showing joint arthrosis and strong pain consistent with mild bilateral median neuropathy (carpal tunnel) in her wrist; (8) progress notes from APS stating Irizarry reported body pain, had fibromyalgia, felt depressed and anxious, and had surgery on her right hand; (9) Irizarry's bipolar diagnosis with psychotic features, insomnia, restlessness, poor impulse control, irritability and aggression; and (10) Dr. Caro's report that Irizarry was depressed, anxious, could not handle funds, and needed assistance lifting objects, cooking, doing laundry, and with transportation. Dkt. 23 at 16–19.

Except for Dr. Caro's report, discussed below, Irizarry never discusses the significance of these documents and how they may affect her RFC. Accordingly, I find she waived her argument that the ALJ needed to discuss these documents to accurately determine her RFC. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Further, even if she did not waive this argument, it is unavailing because "[a]n ALJ is not required to expressly refer to each document in the record, piece-by-piece. He or she may summarize the medical findings reported there." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 915 F.2d 1557 (1st Cir. 1990) (unpublished). Moreover, because Irizarry did not discuss the significance of much of this documentation, she failed to articulate how the ALJ's alleged omission of these records prejudiced her. And "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'" *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (quoting *Palmer v. Hoffman*, 318 U.S.

109, 116 (1943)). Accordingly, Irizarry's mere mention of documents she contends the ALJ overlooked does not warrant remand.

Irizarry does further discuss her claim that the ALJ omitted Dr. Caro's opinion that she could not handle funds. She contends the ALJ deferred instead to treatment notes stating she could manage funds and thus "cherry-picked" the evidence. Dkt. 23 at 19–20. I first note that the ALJ explicitly referenced Dr. Caro's opinion in her decision. Tr. 397. The ALJ, not this court, must resolve conflicting evidence in the record. *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). And this court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán*, 819 F.2d at 3. Here, the ALJ discussed Dr. Caro's opinion, but gave it little weight because Irizarry "reported she is able to pay bills, count change, handle a savings account, and write checks/money orders." Tr. 397 (citing Tr. 476, 1089). The ALJ further observed that mental status examinations found Irizarry could prepare simple meals, wash dishes, sweep, mop, and clean her bathrooms. *Id.* (citing Tr. 475, 1088). And the ALJ concluded by noting that Irizarry's treating physician indicated she could manage money, prepare meals, go shopping, take her medications, drive, and use the telephone. *Id.* (citing Tr. 475, 1088). Because the ALJ examined the conflicting information regarding Irizarry's ability to handle funds, resolved that conflict, and explained her reasoning by citing evidence from the record, substantial evidence supports the ALJ's conclusion.

Irizarry also argues the ALJ failed to give any weight to Dr. Wilfredo Perez Caban's opinion stating she could manage funds and thus did not adequately explain her analysis of the issue. Dkt. 23 at 19–20 (citing Tr. 1350). However, the ALJ was not required to give weight to Dr. Perez Caban's notes because they merely transcribed Irizarry's report of her daily activities. *See*

Tr. 1350. They were not Dr. Perez Caban's *opinion* of what Irizarry could do despite her impairments. *See* 20 C.F.R. § 404.1513(A)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) . . . ."). Accordingly, the ALJ was not required to assign weight to this evidence.

### 2. Non-Severe Impairments

Irizarry also argues the ALJ failed to consider her non-severe impairments when determining her RFC. Dkt. 23 at 24. She contends that the ALJ's analysis consisted of boilerplate language and was thus insufficient. *Id.* The Commissioner responds that the ALJ stated she included environmental limitations after considering, among other things, Irizarry's non-severe impairments. Dkt. 30 at 9–10 (citing Tr. 396). Irizarry cites *Smith v. Saul*, 2019 WL 5957294, at *4 (D.N.H. Nov. 13, 2019) as an example showing that courts in this circuit remand cases where the ALJ relies on boilerplate language, but offers no further analysis.

In *Smith*, the ALJ stated she considered the claimant's non-severe impairments, but included no discussion of those impairments at either Step Three or Step Four. 2019 WL 5957294, at *4. Here, by contrast, the ALJ noted at Step Two that there was no treatment history evidence of limitations stemming from many of Irizarry's non-severe impairments. Tr. 388. At Step Three, the ALJ discussed Irizarry's thyroid disorder, peripheral neuropathy, inflammatory arthritis, and obesity. Tr. 389–90. And at Step Four, the ALJ included environmental limitations based in part on Irizarry's non-severe impairments. Tr. 396. Irizarry correctly points out the ALJ never mentioned some of her non-severe impairments. However, the ALJ stated, "the overall evidence of record supports a finding that any other condition, not specifically mentioned in this decision, but mentioned briefly in the record, is non-severe." Tr. 389. The ALJ then explained this finding by stating she gave attention to duration and frequency of conditions. *Id.* Thus, though the ALJ

used boilerplate language at various points in her decision, she also went far beyond that language and explained her reasoning.

Moreover, Irizarry does not point to evidence indicating any of her non-severe impairments warranted additional limitations. Instead, she relies on her diagnoses. *See* Dkt. 23 at 24. But a diagnosis alone does not establish an impairment's severity or indicate that it results in functional limitations. *Mercado-Acosta v. Commissioner of Social Security*, 2021 WL 4352792, at *4 (D.P.R. Sept. 24, 2021). And Irizarry "had the burden of establishing the extent of her limitations, which the ALJ then used to determine her RFC." *Mosconas v. Saul*, 2020 WL 6255298, at *1 (1st Cir. Sept. 15, 2020). Because Irizarry failed to meet that burden, the ALJ's discussion of her non-severe impairments does not warrant remand.

### 3. Medicinal Side Effects

Irizarry contends the ALJ failed to discuss how the side effects of her medication affected her ability to work. Dkt. 23 at 27–28. The Commissioner responds that the ALJ need not discuss every detail in the record to show she considered it. Dkt. 30 at 20 n.6 (citing *NLRB v. Beverly Enterprises-Massachusetts, Inc.*, 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.")).

Irizarry notes she was prescribed the following medications for her mental health: Bupropion, Ativan, Klonopin, Seroquel, and Depakote. Dkt. 23 at 27. Specifically, she notes she stated Seroquel and Depakote caused involuntary movement in her hands. *Id.* (citing Tr. 627). However, Irizarry reported that side effect in June 2021. And, as discussed, her date last insured was December 31, 2020. Accordingly, that reported side effect had no bearing on her ability to work during the relevant period. Thus, the ALJ's failure to mention it does not warrant remand.

### B.  Inadequately Explained Conclusions

### 4.  Light Work

Irizarry argues the ALJ failed to explain how she determined she could perform light work given her need to alternate positions and inability to walk, sit, stand for long stretches. Dkt. 23 at 20. But the ALJ stated she gave some weight to findings by Drs. Wheelock, Marrero, and Nieves stating that Irizarry should be restricted to light work. Tr. 396. And Irizarry does not challenge those findings. Though Irizarry also contends the ALJ discounted her complaints that she couldn't stand for too long, Dkt. 23 at 20, the ALJ explained she instead gave weight to the opinions of Drs. Wheelock, Marrero, and Nieves that Irizarry could stand for up to six hours in an eight-hour workday. Tr. 396. As discussed, the ALJ, not this court, resolves conflicting evidence in the record and this court must uphold that conclusion if supported by substantial evidence. Because the ALJ's conclusion is supported by these three doctors, while Irizarry only cites her own testimony to the contrary, the ALJ's determination is supported by substantial evidence.

### 5.  Bipolar Disorder

Turning to her bipolar disorder, Irizarry contends the ALJ failed to mention any symptoms, treatment, medication and/or effects relating to this condition when determining her RFC. Dkt. 23 at 21. The ALJ found Irizarry's bipolar disorder constituted a severe impairment at Step Two. Tr. 388. And when determining Irizarry's RFC, the ALJ noted that symptoms from her anxiety, bipolar, and depressive disorders "include[d] crying spells, irritability, anger, depressed mood, social isolation, anxiety, irrational fears, poor sleep, poor concentration, memory problems, poor self-esteem, and feelings of worthlessness." Tr. 394. The ALJ then discussed various mental health evaluations. Tr. 394–96. She also mentioned that Irizarry underwent group therapy and psychiatric

treatment and that the former "significantly improved her condition." Tr. 395. Accordingly, I find Irizarry's inaccurate characterization of the record does not warrant remand.

I note Irizarry also argues the ALJ did not explain which mental health symptoms stemmed for which of her three conditions: anxiety, depression, and bipolar disorder. Dkt. 23 at 21. She contends this is insufficient under 20 C.F.R. § 404.152 and the Appeals Council order remanding the ALJ's prior decision in this case. *Id.* Because I could not find a regulation matching 20 C.F.R. § 404.152, I assume Irizarry is referring to 20 C.F.R. § 404.1520, entitled "Evaluation of Disability in General." However, Irizarry does not point to a specific portion of this regulation the ALJ violated in her analysis and I fail to see one. The regulation states the Commissioner will evaluate a claimant's RFC as explained in 20 C.F.R. § 404.1545. *See* 20 C.F.R. § 404.1520(e). And with respect to mental impairments, that regulation states the Commissioner must "first assess the nature and extent of [a claimant's] mental limitations and restrictions and then determine [a claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545. It does not say the ALJ must explain which limitation stems from which mental condition. Further, the Appeals Council order simply remanded the ALJ's prior decision because the Appeals Council found the ALJ incorrectly determined Irizarry's last insured date was December 31, 2017 instead of December 31, 2020. Tr. 807–08. It then asked the ALJ to consider Irizarry's RFC during that extended period and cite the record to support her findings. *Id.* As discussed, the ALJ followed the Appeals Council's instructions when discussing Irizarry's mental health. Accordingly, her analysis does not warrant remand.

## 6.  **Irizarry's Subjective Complaints**

Irizarry also challenges the ALJ's finding that her subjective complaints of pain were insufficient to establish a disability. She argues she may rely solely on subjective evidence to prove

symptoms prevent her from working. Dkt. 21 at 22–23. She cites language from courts in this circuit that have found "boilerplate assertion[s] that an ALJ considered all of the claimant's impairments in combination, without describing any actual analysis, is insufficient." Dkt. 23 at 22 n.7 (citing *Smith v. Saul*, 2019 WL 5957294, at *4 (D.N.H. Nov. 13, 2019) (further citations omitted)). And she cites a Fourth Circuit case finding a claimant is "'entitled to rely exclusively on subjective evidence to prove' that her symptoms were 'so continuous and/or so severe that [they] prevent[ed] [her] from working.'" *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 96 (4th Cir. 2020) (alterations in original) (quoting *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006)).

First, the ALJ did not rely on boilerplate statements that she considered all of Irizarry's impairments. I note the ALJ included boilerplate language such as, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 393. However, the ALJ then explained that conclusion in an analysis spanning over five pages and cited evidence from the record throughout her discussion. *See* Tr. 393–398.

Irizarry's contention the ALJ inappropriately found objective evidence did not support subjective complaints of pain also does not warrant remand. When considering whether a claimant's symptoms limit her capacity to work, an ALJ must consider objective evidence. 20 C.F.R. § 404.1529(c)(2); *see also Derbes v. Saul*, 2019 WL 3494399, at *1 (1st Cir. July 26, 2019) (citing 20 C.F.R. § 404.1529 (2016)) ("The ALJ was required to consider objective medical signs during physical examinations in evaluating subjective symptoms . . . and the lack of that evidence was relevant to the ALJ's evaluation."). However, I note that an ALJ may not reject a claimant's subjective complaints "solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2). And an ALJ must consider other

information, such as a claimant's daily life activities; location, duration, frequency, and intensity of pain; medication; and other treatment. *Id.* § 404.1529(c)(3); *see also* SSR 16-3p ("In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.").

Here, the ALJ began with Irizarry's subjective allegations at both of her hearings. Tr. 393. Then, the ALJ turned to objective medical records. Tr. 393–95. Finally, the ALJ examined opinion evidence from various medical professionals as to what Irizarry could do despite her limitations. Tr. 395–97. Those records documented Irizarry's descriptions of daily activities, medication, and other treatment. *Id.* Thus, the ALJ properly considered Irizarry's subjective complaints of pain along with other evidence in the record in making her determination.

### 7. Inadequate Citations to Record

As discussed above, Irizarry argued the ALJ failed to follow the Appeals Council's instructions to cite specific evidence in the record when discussing Irizarry's bipolar disorder. Irizarry also argues the ALJ failed to offer more than boilerplate language throughout the remainder of the RFC analysis. Dkt. 23 at 23–25. However, that argument is unconvincing.

Irizarry contends the ALJ relied on boilerplate statements for her analysis of findings by Dr. Falla, Dr. Wheelock, Dr. Marrero, and Dr. Nieves. Dkt. 23 at 23–24. Again, it is true that the ALJ used boilerplate language, as Irizarry contends. However, the ALJ went far beyond that language in her six-page explanation of Irizarry's RFC. First, the ALJ discussed Dr. Falla's letter stating Irizarry "should not perform any repetitive movements in her left hand, and should not lift,

carry, pull, or push" with that hand. Tr. 396. However, the ALJ found Dr. Falla wrote that letter before Irizarry had surgery in that hand. *Id.* Thus, she deferred to a more recent nerve conduction study finding Irizarry had "mild bilateral median neuropathy at the wrist, consistent with bilateral carpal tunnel syndrome." *Id.* Accordingly, she included handling and fingering limitations in the RFC. Tr. 392.

Similarly, Irizarry argues the ALJ merely summarized the findings of Drs. Wheelock, Marrero and Nieves before concluding with boilerplate language. Dkt. 23 at 23–24. However, that contention ignores the ALJ's entire analysis, in which she explains those opinions are given some weight based on examinations showing Irizarry's gait was normal; treating physician notes stating she could care for her personal hygiene independently, do light household chores, manage money, prepare meals, go shopping, take her medications, drive, and use the telephone; and her cervicalgia and lumbago diagnoses. *Id.* The ALJ thus determined Irizarry could perform light work. *Id.* And she further explained that she did not add overhead reaching limitations for Irizarry's left arm because Irizarry had normal range-of-motion in that arm during the internal medicine consultative examination. *Id.* Accordingly, contrary to Irizarry's contention, the ALJ went well beyond mere boilerplate language in her analysis.

### III.   Step Five – VE's Testimony

Irizarry contests VE Guillermo Peña's testimony that she could work as a garment sorter, cafeteria attendant, or classifier. She notes that, while her RFC states she can perform simple, routine, repetitive tasks, the jobs listed by the VE all fall under General Educational Development ("GED") reasoning category two, which requires the ability to carry out detailed instructions. Dkt. 23 at 32 (citing Tr. 392, 399). And she contends the ALJ's failure to reconcile this discrepancy is a reversable error. *Id.* The Commissioner responds that Irizarry waived this argument by failing to

raise it at the hearing. Dkt. 30 at 25. Further, even if Irizarry did not waive this issue, the Commissioner contends the listed jobs only require the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Dkt. 30 at 26 (alterations in original) (quoting *Allison P. v. Berryhill*, 2019 WL 1373646, at *5 (D. Me. Mar. 24, 2019)).

Where another claimant argued an ALJ failed to resolve the conflict between the RFC limitation of "simple, repetitive work," and a GED reasoning level of three, this court explained "the ALJ need only resolve such conflicts where they are apparent and have been identified." *Cruz Madera v. Saul*, 2021 WL 9100419, at *13 (D.P.R. Feb. 26, 2021). And "[b]ecause the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict." *Id.* The same is true here. Moreover, "DOT-assigned GED reasoning levels two and three have both been found to be consistent with an RFC limitation to simple and unskilled tasks." *Id.* (further citation omitted). Accordingly, there is no apparent conflict between the ALJ's RFC determination and the VE's statement that Irizarry could work as a garment sorter, cafeteria attendant, or classifier.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision **AFFIRMED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of March 2024.

S/ *Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge